**DATASOUTH COMPUTER CORP., Plaintiff,**

v.

**THREE DIMENSIONAL TECHNOLOGIES, INC., Defendant.**

No. C-C-89-209-P.

United States District Court, W.D. North Carolina, Charlotte Division.

Aug. 7, 1989.

David B. Hamilton, Richard E. Fay, Petree Stockton & Robinson, Charlotte, N.C., for plaintiff.

Joel S. Rubin, Roger S. Davis, Davis & Rubin, Boston, Mass., for defendant.

## ORDER

ROBERT D. POTTER, Chief Judge.

### I. PRELIMINARY STATEMENT

THIS MATTER is before the Court on (1) Defendant's Motion to Stay Proceedings, filed June 30, 1989, (2) Defendant's Motion to Dismiss for Lack of Jurisdiction, filed June 30, 1989, (3) Defendant's Alternative Motion to Transfer Venue, filed June 30, 1989, and (4) Defendant's Motion for Protective Order Regarding Discovery and Request for Stay, filed July 13, 1989.

The parties have filed briefs and affidavits in support of, and in opposition to, Defendant's motions. Neither party has requested to be allowed to offer oral testimony.

The parties have adequately briefed the issues, and, therefore, this Court will dispose of Defendant's motions without a hearing because oral argument would not significantly aid this Court's decision-making process.[1]

For the reasons that follow this Court will (1) grant Defendant's Motion to Stay Proceedings, (2) deny, as moot, Defendant's Motion to Dismiss for Lack of Jurisdiction, (3) grant Defendant's Alternative Motion to Transfer Venue, (4) deny, without prejudice, Defendant's Motion for Protective Order Regarding Discovery and Request for Stay, and (5) direct the Clerk to transfer the file of this case to the District of Massachusetts.

### II. BACKGROUND [2]

This is, essentially, a contract action. Plaintiff, Datasouth Computer Corporation ("Datasouth"), is a North Carolina corporation that has its principal place of business in Charlotte, North Carolina. (Waller Aff. at 17). Datasouth is engaged in the business of designing, manufacturing, marketing, and selling high performance dot matrix printers, which are used with computers to produce graphics and text. (*Id.*).

---

1. *See* W.D.N.C.R. 8; Fed.R.Civ.P. 78; *see also* Fed.R.Civ.P. 43(e) ("[w]hen a motion is based on facts not appearing of record the court may hear the matter on affidavits presented by the respective parties").

2. Rule 52(a) of the Federal Rules of Civil Procedure states, in pertinent part, "Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b)." Fed.R.Civ.P. 52(a). In the present case, however, this Court is of the opinion that it will be useful to provide the parties—and any reviewing court—with a detailed discussion on the pending motions. *See* 1A Pt.2 J. Moore, W. Taggart, A. Vestal, J. Wicker & B. Ringle, *Moore's Federal Practice* Para. 0.345[5] (2d ed. 1989) ("While it has been stated that a written opinion setting forth the reasons for transfer is highly desirable, such an opinion, or even an oral opinion, is not essential if the record shows that the proper factors were considered." (footnotes omitted)) [hereinafter *Moore's Federal Practice* ]. In so doing, this Court does *not* intend to make any findings of fact or conclusions of law regarding the ultimate merits of Plaintiff's claims against Defendant.

For the past several years, Datasouth has had its employees working on the "Fred Printer Project," the purpose of which is to incorporate into Datasouth's product line a state-of-the-art, durable, high-quality, high performance line of printers, to be known as the Performax Line. (*Id.*)

Defendant, Three Dimensional Technologies, Inc. ("3D"), is a Massachusetts corporation that has its principal place of business in Hanover, Massachusetts. (Aronson June 27, 1989 Aff. at 1). 3D is engaged in the business of designing and producing plastic components for its customers. (*Id.* at 2). In the course of its business, 3D designs and produces (1) the tooling necessary to produce such plastic components and (2) models—or prototypes—of the components. (*Id.*). 3D also provides support services to its customers. (*Id.*). 3D does not maintain an office in North Carolina, and it does not have any employees, salesmen, or agents in North Carolina. (*Id.* at 3). 3D does not regularly solicit business in North Carolina nor does it provide goods or services there or receive substantial revenues from businesses in North Carolina on a systematic and continuous basis. (*Id.*).

During the latter part of 1986, 3D's employee, Peter Harrison ("Harrison"), made two trips to Datasouth's offices in Charlotte for the purpose of soliciting business on behalf of 3D. (Waller Aff. at 2). Harrison's first trip was a sales call to determine if Datasouth would be interested in using 3D's services, and his second trip was to give a full-scale presentation of 3D's services and to discuss the possibility of Datasouth engaging 3D to work on the Fred Printer Project. (*Id.*). 3D's role in the Fred Printer Project would be to design and manufacture the plastic cover, or shell, that would contain the mechanical and electrical components of the printer. (*Id.*). Specifically, 3D would design the cover and would design and manufacture the tools, or injection-molds, from which the cover would be fabricated. (*Id.*). 3D's work on the Fred Printer Project would have several phases, including (1) the concept phase, (2) the design support phase, (3) the engi-

neering support phase, and (4) the manufacturing support phase. (*Id.* at 2–3).

The printer cover was an integral part of the high performance dot matrix printer Datasouth was developing, and, therefore, large amounts of technical information would need to be exchanged between Datasouth and 3D. (*Id.* at 3).

In the spring of 1987, 3D began to work on the printer cover for the Fred Printer Project, and the parties exchanged a large amount of technical, and other, information by various means. (*Id.*). During this period, on at least four occasions 3D's representatives, including its President, Steven R. Aronson ("Aronson"), met with Datasouth's representatives at Datasouth's offices in Charlotte to work on the development of the printer cover. (*Id.* at 3–4).

In the spring of 1988, Datasouth and 3D determined that the design concept 3D was developing was unacceptable and unworkable, and the parties agreed to cancel 3D's involvement in the Fred Printer Project. (*Id.* at 4).

In April, May, and June of 1988, Datasouth and 3D began discussions regarding a new concept for the printer cover, and they conducted negotiations relating to a contract between Datasouth and 3D. These negotiations took place at Datasouth's offices in Charlotte on at least four occasions. (*Id.*).

On July 1, 1988, Datasouth and 3D entered into a contract concerning 3D's work on the Fred Printer Project (the "Contract"). (Complaint, Exh. A; Aronson June 27, 1989 Aff. at 2; Waller Aff. at 4). The Contract provides that 3D will perform various services for Datasouth, including the following:

(1) preparation of prints, plans, sketches, and renderings;

(2) computer-aided design of the plastic components covered by the Contract;

(3) the making of models and mock-ups; and

(4) the making of Low Pressure Injection Molding ("LPIM") molds and parts.

(Aronson June 27, 1989 Aff. at 2).

The Contract also provides that it is to be governed by the law of Massachusetts.

By the terms of the Contract, Datasouth transmitted to 3D various instructions, specifications, changes in specifications, and documents. (*Id.*). 3D sent to Datasouth numerous concept sheets, plots, sketches, computer data bases, and other documentation. (Waller Aff. at 4).

Between September 9, 1988 and May 13, 1989, 3D's representatives met with Datasouth's representatives in Charlotte on at least five occasions to work on the project. (*Id.* at 4). 3D also delivered to DataSouth in Charlotte various items, including models, molds, and low-pressure injection molds ("LPIM"); all totalled, 3D shipped seventeen (17) LPIM sets and other parts to Datasouth in Charlotte. (*Id.* at 5, Exh. B).

Under the terms of the Contract, Datasouth has paid 3D the sum of $689,725.00, which includes an advance payment made on tools 3D was to have delivered to Datasouth during the manufacturing support phase; 3D allegedly never delivered the tools and never commenced performance under the manufacturing support phase. (*Id.* at 6).

3D represents that the work performed for Datasouth caused 3D to incur substantial financial losses. (Def't's Memo. In Support of Alternative Motion to Transfer Venue, Exh. B (showing cash position of $1,692.00 and a stockholder deficit of $1,379,929.00); Aronson July 25, 1989 Aff. at 4–6 (3D's financial "situation has worsened")).[3]

On May 12, 1989, Datasouth commenced this action against 3D. Datasouth alleges in its Complaint that 3D and Datasouth had "discussions and negotiations concerning the ability of [3D] to provide a 'vertical' line of services and materials for Datasouth which would culminate in the production of tools, or steel molds, from which the enclosure, or cover of the [Datasouth's] Performax line of printers could be manufactured." (Complaint at 2). Datasouth further alleges that it relied upon 3D's representations and entered into a contract with 3D for the provision of goods and services. Finally, Datasouth alleges that 3D (1) anticipatorily breached the Contract (Complaint, Count I), (2) breached the Contract (Count II), and (3) negligently failed to perform the work required under the Contract (Count III).

On June 30, 1989, 3D filed its Motion to Dismiss, in lieu of an answer.

This Court's subject-matter jurisdiction over the present case is based upon the complete diversity of citizenship of the parties and the amount in controversy, which exceeds ten thousand dollars ($10,000.00). 28 U.S.C.A. § 1332(a)(1) (West Supp.1989) (suits involving citizens of different states).[4] Venue is proper in the Western District of North Carolina because Plaintiff has its principal office and place of business in this District. 28 U.S.C.A. § 1391(a) (West 1976).

## III. DISCUSSION

### A. *Venue*

■ Defendant is seeking transfer of the present action to the District of Massachusetts, pursuant to Section 1404(a) of Title 28, United States Code. Defendant is also seeking to dismiss the present action, pursuant Rule 12(b)(2) of the Federal Rules of Civil Procedure, asserting that this Court lacks personal jurisdiction over it. This Court will consider and grant the motion to transfer without resolving the jurisdictional issue. *See Kahhan v. City of Fort Lauderdale*, 566 F.Supp. 736, 738 (E.D.Pa.

---

**3.** Datasouth has offered a financial report, printed out by Dunn & Bradstreet, Inc. on January 23, 1989, to contradict 3D's representations concerning 3D's present financial condition. The information contained within the report refers to Hapco, Inc. ("Hapco"), a separate corporation, which is not a party to this action. (Aronson July 25, 1989 Aff. at 4). 3D appears to be a wholly-owned subsidiary of Hapco. The "statement date" of the report is December 21, 1986. The report shows that approximately two and one half years ago Hapco had total assets of $1,137,116.00. According to Aronson, Hapco's present financial condition is not accurately reflected by the report. (*Id.* at 4). This Court is of the opinion that in light of these facts the Dunn & Bradstreet report for Hapco has little, if any, relevance to the present case.

**4.** For cases commenced after May 18, 1989, the diversity minimum has been raised to $50,000.00.

1983). Although this Court may not have personal jurisdiction over 3D,[5] it still has the power to transfer the action to another district pursuant to Section 1404(a). *Id.; Internatio–Rotterdam, Inc. v. Thomsen*, 218 F.2d 514, 516–517 (4th Cir.1955); *Ulman v. Boulevard Enters., Inc.*, 638 F.Supp. 813, 815 & n. 7 (D.Md.1986) ("Where personal jurisdiction is lacking but venue is present, the original forum court has the authority to transfer pursuant to and in accordance with 28 U.S.C. § 1404(a), provided, of course, that subject matter jurisdiction exists in the original forum court."); *cf. Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962) (transferor court need not have had jurisdiction over defendant to effect transfer under 28 U.S.C. § 1406(a)); *United States v. Berkowitz*, 328 F.2d 358, 361 (3d Cir.) (applying *Goldlawr* rationale to § 1404(a)), *cert. denied*, 379 U.S. 821, 85 S.Ct. 42, 13 L.Ed.2d 32 (1964). *See generally* Annotation, *Construction and Application of Change of Venue of Transfer Provision of Judicial Code (28 USC § 1404(a)), Apart from Question of Convenience and Justice of Transfer*, 7 A.L.R.Fed. 9, 38–41 (1971).

■■ Section 1404(a) states, in pertinent part, the following: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C.A. § 1404(a) (West 1976). Yet, Section 1404(a)'s language is too general to be dispositive in most specific cases. *Board of Trustees, Sheet Metal Workers Nat'l Fund v. Baylor Heating & Air Conditioning, Inc.*, 702 F.Supp. 1253, 1255 (E.D.Va. 1988). If venue is proper in the transferor forum, and if the proposed transferee forum is one where the action might have been brought, then the district courts have substantial discretion to decide Section 1404(a) transfer motions by weighing various judge-made factors, all of which have been developed to take account of "the convenience of the parties and witnesses"

or "the interest of justice" or both. *E.g., id.* at 1255–57 & nn. 6, 14 ("the transfer calculus is qualitative, not quantitative"); *see also Akers v. Norfolk & W. Ry. Co.*, 378 F.2d 78, 80 (4th Cir.1967) (reversal of § 1404(a) transfer decision for abuse of discretion).

Under Section 1391(a) of Title 28, United States Code, the Western District of North Carolina—the transferor forum—is a proper forum for the present case because Plaintiff resides in this District; North Carolina is Datasouth's state of incorporation, and Datasouth has its principal place of business in Charlotte, which is within the Western District of North Carolina. Under Section 1391(a) and Section 1391(c), the District of Massachusetts—the prospective transferee district—is a district where this action might have been brought because 3D was subject to personal jurisdiction there at the time Plaintiff's action was commenced. 28 U.S.C. § 1391(a), (c) (West 1976 & Supp.1989) ("a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced"). Thus, the two basic prerequisites for Section 1404(a) transfer have been met.

■■ Courts consider and weigh the following judge-made factors when ruling on Section 1404(a) motions to transfer: (1) plaintiff's initial choice of the forum; (2) the relative ease of access to sources of proof; (3) availability of compulsory process for attendance of unwilling, and the costs of obtaining attendance of willing, witnesses; (4) possibility of view of premises, if view would be appropriate to the action; (5) enforceability of a judgment if one is obtained; (6) relative advantages and obstacles to a fair trial; (7) all other practical problems that make a trial easy, expeditious, and inexpensive; (8) administrative difficulties of court congestion; (9) local interests in having localized controversies settled at home; (10) the appropriateness in

---

**5.** For a discussion on why this Court may not have personal jurisdiction over Defendant, see

*infra* note 7 and accompanying text.

having the trial of a diversity case in a forum that is at home with the state law that must govern the action; and (11) avoidance of unnecessary problems with conflict of laws. *E.g., DMP Corp. v. Fruehauf Corp.*, 617 F.Supp. 76, 77 (W.D.N.C. 1985); *see also* 1A Pt. 2 *Moore's Federal Practice, supra* note 2, at Para. 0.345[5] (citing numerous cases, including *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), where factors originated).[6] "The combination and weight of factors requisite to a given result cannot be cataloged. At stake is the art of judging." *Id.* at 4363. When weighing these factors, the court must keep in mind that a party seeking transfer pursuant to Section 1404(a) has the burden of persuasion and must show (1) "more than a bare balance of convenience in his favor" and (2) "that a transfer does more than merely shift the inconvenience." *DMP Corp. v. Fruehauf Corp.*, 617 F.Supp. at 77.

■ This Court will consider the facts of the present case in light of each of the above-listed factors.

### 1. Plaintiff's Choice of Forum

As this Court has noted several times, it is "black letter law", that " 'a plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request, and that choice ... should not be lightly disturbed.' "

*Western Steer—Mom 'N' Pop's, Inc. v. FMT Investments, Inc.*, 578 F.Supp. 260, 265 (W.D.N.C.1984) (quoting *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 374 F.Supp. 184, 191 (D.Del.1974) (quoting *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir.1970), *cert. denied*, 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971))); *Phillips v. S. Gumpert Co., Inc.*, 627 F.Supp.

725, 726–727 (W.D.N.C.1986); *Bates v. J.C. Penney Co., Inc.*, 624 F.Supp. 226, 227 (W.D.N.C.1985). Thus, this factor weighs against transfer of this case to the District of Massachusetts.

### 2. Ease of Access to Sources of Proof

3D represents that it has in its possession in Massachusetts relevant physical evidence consisting of the following:

(1) three hundred (300) plans and prints, approximately one hundred (100) sketches and renderings, and five hundred (500) to seven hundred (700) prints/plans in 3D's computer, which have not been printed out yet;

(2) five volumes of correspondence and documents, containing approximately four thousand (4000) to five thousand (5000) pages;

(3) fifteen (15) models/mock-ups, each with an approximate size of three cubic feet;

(4) seven (7) LPIM molds;

(5) various computer tapes and disks; and

(6) in excess of thirty (30) additional printer parts and components.

(Aronson Aff. at 3–4). 3D contends that it would be a tremendous financial hardship to force 3D to transfer all of this physical evidence to Charlotte. (*Id.*).

Datasouth represents that it has in its possession in Charlotte "a great deal of correspondence, facsimile transmissions, plots, sketches, drawings, concept sheets, and computer data bases," which 3D sent to Datasouth. (Waller Aff. at 8). In addition, Datasouth represents that it has in its possession in Charlotte seventeen (17) LPIM sets and other parts and models. (*Id*). Datasouth asserts that it will need

---

**6.** The *Gilbert* court was using these enumerated factors to determine whether a dismissal would be appropriate under the doctrine of forum non conveniens. Section 1404(a), however, only authorizes transfer, not dismissal, and, therefore, § 1404(a) transfers may be granted more liberally than forum non conveniens dismissals. *Norwood v. Kirkpatrick*, 349 U.S. 29, 32, 75 S.Ct. 544, 546, 99 L.Ed. 789 (1955) ("the relevant factors have [not] changed, but ... the discre-

tion to be exercised is broader"); *Jiffy Lubricator Co. v. Stewart–Warner Corp.*, 177 F.2d 360, 362 (4th Cir.1949), *cert. denied*, 338 U.S. 947, 70 S.Ct. 484, 94 L.Ed. 584 (1950). *See generally* 1A Pt. 2 *Moore's Federal Practice, supra* note 2, at Para. 0.345[5], 4362–81. Nevertheless, the *Gilbert* factors are useful as an analytical tool to evaluate § 1404(a) motions to transfer. *Id.* at 4379.

all of these items as physical evidence during a trial of the present case.

Thus, both sides assert that they have in their possession numerous documents, models, drawings, and other items of physical proof which will be crucial to their respective cases. Both sides also assert that they will incur substantial costs if they are forced to transport such items to a distant forum.

3D's financial resources appear to be less than Datasouth's resources, and, therefore, it will be more burdensome for 3D to transport physical evidence to this District. Therefore, this factor weighs slightly in favor of transferring this case to the District of Massachusetts.

### 3. Witnesses

3D represents that there are at least thirty present or former employees of 3D who were involved in the performance of services for Datasouth and who are potential witnesses in the present case. (Aronson Aff. at 4). 3D intends to call at least fifteen of these witnesses, all of whom reside in Massachusetts. (*Id.*). 3D contends that it will have to forego the live testimony of many of these planned witnesses if it is forced to defend in North Carolina against Plaintiff's claims. (*Id.*).

Datasouth represents that it expects to call as witnesses at trial nine (9) present and former employees of Datasouth who have personal knowledge of the subject matter of the present case. (Waller Aff. at 6–7).

Again, both sides assert that they will need to call numerous witnesses, some of whom may be unwilling to testify. Thus, either Datasouth or 3D will have to incur substantial costs to bring their willing witnesses to trial, and either side may well have to forego the live testimony of any unwilling witnesses. It appears, however, that 3D expects to call more witnesses than Datasouth. This Court has carefully examined 3D's proffer regarding the expected testimony of these witnesses and is of the opinion that the testimony of these witnesses will be reasonably necessary for 3D's defense. It also appears that 3D's finan-

cial resources are less than Datasouth's resources, and, therefore, it will be considerably more burdensome for 3D to provide transportation for its witnesses. Therefore, this factor weighs slightly in favor of transferring this case to the District of Massachusetts.

### 4. View of Premises

At this point, it appears that view of premises will not be required in this case.

### 5. Enforceability of Possible Judgment

Nothing in the record indicates that a judgment rendered in this case will be any more enforceable if it is rendered in this District rather than the District of Massachusetts.

### 6. Relative Advantages and Obstacles to a Fair Trial

Defendant asserts that it will endure greater relative hardship than Plaintiff if it is forced to litigate in this District. Two specific possible causes of hardship have already been discussed above.

Defendant notes that its net worth is substantially less than Plaintiff's net worth; Defendant concludes that Plaintiff can afford to try its case in the District of Massachusetts better than Defendant can afford to defend in this District. This factor weighs heavily in favor of transferring this case to the District of Massachusetts.

### 7. *Other Practical Problems*

Courts have held that a change of venue may conserve judicial resources, and serve the interests of the parties as well, if a case is transferred from a forum where there is a difficult question of personal jurisdiction or venue to a district in which there are not such uncertainties. *Kahhan v. City of Fort Lauderdale*, 566 F.Supp. 736, 738, 740 (D.Pa.1983) (transfer obviating jurisdictional difficulty serves interests of justice with meaning of § 1404(a)); *Donnelly v. Klosters Rederi A/S*, 515 F.Supp. 5, 7 (E.D.Pa. 1981) ("Substantial time, money and effort will be required to determine ... prelimi-

nary jurisdictional issue which [will be] rendered unnecessary if the action is transferred to [a district] which has *in personam* jurisdiction over defendant and is a forum where the action might have been brought."), *motion denied,* 1984 Am.Mar. Cas. 763 (S.D.Fla.1982); *X–Rail Sys., Inc. v. Norfolk & W. Ry. Co.,* 485 F.Supp. 553, 555 (D.N.J.1980) ("Transfer will ... strike a constructive blow in support of the need to eliminate avoidable discovery, and aid in the inexpensive determination of the action, Rule 1, F.R.Civ.P., since it will render moot the dispute over minimum contacts."); *Terukuni Kaiun Kaisha v. C.R. Rittenberry & Assocs.,* 454 F.Supp. 418, 422–423 (S.D. N.Y.1978) (prosecuting action in district where personal jurisdiction can clearly be obtained over defendant will avoid risk of squandered energies on personal jurisdiction issue); *see also* 15 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3854, at 469–470 & n. 31 (1986) (citing cases); *cf. Porter v. Groat,* 840 F.2d 255, 257–258 (4th Cir.1988) (court may transfer action pursuant to 28 U.S.C. § 1406(a) whenever impediment to adjudication on merits exists—such as lack of personal jurisdiction); *McLaughlin v. Copeland,* 435 F.Supp. 513, 534 (D.Md. 1977) ("While transfer ... will cause plaintiff some minimal hardship, this inconvenience is outweighed by the substantial advantage of having the case tried by a court whose jurisdiction is certain.").

In the present case there is at least a serious question whether this Court's assertion of personal jurisdiction over 3D can meet the requirements of the due process clause of the United States Constitution.[7] Resolution of this difficult issue would require a substantial expenditure of additional resources. A change of venue to the District of Massachusetts will completely moot the issue of personal jurisdiction, since that district is where 3D is incorporated and is certainly subject to the in personam jurisdiction of the federal courts. A change of venue to the District of Massachusetts will, therefore, save judicial resources by making it unnecessary to decide the problematic jurisdictional issue. Therefore, this factor weighs in favor of transferring this case to the District of Massachusetts.

### 8. Administrative Difficulties of Court Congestion

Certain statistics regarding the District of Massachusetts and the Western District of North Carolina are relevant to this factor.

| Workload Statistics | W.D.N.C. | D.Mass. |
|---|---|---|
| Pending Civil Cases per Judgeship | 340 | 616 |
| Median Time From Filing to Disposition | 6 months | 13 months |
| Median Time From Issue to Trial | 8 months | 27 months |
| Number (and %) of Civil Cases Over 3 Years Old | 14 (1.6%) | 2,392 (33.7%) |

Administrative Office of the United States Courts, *Federal Court Management Statistics, 1988* 38, 68.

This factor weighs against transfer of the present case to the District of Massachusetts.

### 9. Local Interests

Plaintiff is not a mere forum shopper. Plaintiff is a North Carolina corporation, with its principal place of business in this District, and, thus, this District has a very strong interest in the issues at stake in the present case.

On the other hand, the District of Massachusetts is where Defendant is incorporated and where Defendant has its principal

---

**7.** *Chung v. NANA Development Corp.,* 783 F.2d 1124 (4th Cir.), ("isolated" or "attenuated" single transaction deemed inadequate to satisfy due process), *cert. denied,* 479 U.S. 948, 107 S.Ct. 431, 93 L.Ed.2d 381 (1986); *Phoenix America Corp. v. Brissey,* 46 N.C.App. 527, 265 S.E.2d 476 (1980); *Modern Globe, Inc. v. Spellman,* 45 N.C. App. 618, 263 S.E.2d 859 (1980). The most important factor that this Court would have to consider when deciding the personal jurisdiction issue is the severe inconvenience and financial strain 3D would suffer if forced to defend in this District against Plaintiff's claims. It appears to this Court that such harms could well be so "unfair" and so "unreasonable" as to render the assertion of personal jurisdiction over 3D unconstitutional.

place of business, and, thus, the District of Massachusetts also has a very strong interest in the issues at stake.

This factor does not change the balance one way or the other.

### 10. Interpretations of State Law by Forum Court

The Contract provides that Massachusetts law will govern its terms. Obviously, a federal district court judge sitting in Massachusetts will have a greater familiarity with Massachusetts general contract law and with the Massachusetts version of the Uniform Commercial Code ("U.C.C.")—which may be applicable—including Massachusetts case law interpreting the U.C.C. Thus, this factor weighs in favor of transferring the present case to the District of Massachusetts.

### 11. Avoidance of Choice of Law Problems

Since the Contract has a choice of law provision, there will be no need for any court to decide which state's law should govern. Therefore, there is no choice of law problem in this case.

Summary

Weighing all of these factors together, this Court is of the opinion that this case should be transferred to the District of Massachusetts. Such a result appears, under all the circumstances, to be fair and reasonable. Transfer will allow 3D—an apparently financially troubled corporation—to defend vigorously against Datasouth's claims. Datasouth, which is much stronger financially, will only be marginally inconvenienced by the transfer.

### B. *Personal Jurisdiction*

Since this Court will transfer this case to the District of Massachusetts, this issue is moot.

### C. *Discovery*

3D is seeking an order from this Court regarding Plaintiff's Request for Production of Documents and a proposed protective order. 3D has requested in its motion that this Court stay its decision on the motion pending resolution of 3D's Motion to Transfer. This Court has now acted on 3D's Motion to Transfer and is of the opinion that this discovery matter should be taken up with the district court in Massachusetts. Therefore, this Court will deny, without prejudice, Defendant's Motion for Protective Order Regarding Discovery.

### D. *Stay of Proceedings*

Defendant is seeking an order from this Court permitting it to defer filing a responsive pleading to Plaintiff's Complaint and to defer production of any documents which may be responsive to Plaintiff's First Request for Production of Documents until thirty (30) days after this Court rules on Defendant's Motion to Dismiss or Motion to Transfer. Plaintiff opposes the motion.

This Court has carefully considered Defendant's Motion to Stay Proceedings and is of the opinion that such motion should be granted to give the parties an opportunity to take account of, and intelligently react to, this Order, which grants Defendant's Alternative Motion to Transfer. In addition, there will be at least some delay between the time this Order is filed and the transfer of this action to the District of Massachusetts; a limited stay of proceedings will not prejudice Plaintiff and will allow this action to proceed in an orderly and unhurried way in the District of Massachusetts.

## IV. CONCLUSIONS

For the reasons stated in this Order, IT IS ORDERED that:

(1) Defendant's Motion to Stay Proceedings, filed June 30, 1989, is GRANTED;

(2) Defendant's Motion to Dismiss for Lack of Jurisdiction, filed June 30, 1989, is DENIED, as moot;

(3) Defendant's Alternative Motion to Transfer Venue, filed June 30, 1989, is GRANTED; and

(4) Defendant's Motion for Protective Order Regarding Discovery and Request for Stay, filed July 13, 1989, is DENIED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that this case shall be, and hereby is, TRANSFERRED to the District of Massachusetts.

The Clerk is directed to TRANSFER the file of this case to the United States District Court for the District of Massachusetts for further proceedings.