AMERICAN MOTORISTS
INSURANCE COMPANY,
Plaintiff,

v.

CTS CORPORATION, Defendant.

No. 1:03 CV 222.

United States District Court,
W.D. North Carolina,
Asheville Division.

Feb. 16, 2005.

Stephen J. Grabenstein, Asheville, NC, Michael W. Morrison, Dale R. Kurth, Heather C. Sullivan, Tressler, Soderstrom, Maloney & Priess, Chicago, IL, for Plaintiff.

Paul W. Schroeder, Jones, Day, Reavis & Pogue, Michael W. Morrison, Dale R. Kurth, Heather C. Sullivan, Tressler, Soderstrom, Maloney & Priess, Chicago, IL, Elizabeth Ellen McConnell, Northup & Mcconnell, PLLC, Stephen J. Grabenstein, Asheville, NC, for Defendants.

### MEMORANDUM AND ORDER
### OF TRANSFER[.]

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the Defendant's motion to transfer venue to the United States District Court for the Northern District of Indiana and the Plaintiff's opposition thereto. For the reasons stated herein, the motion is granted.

### I. PROCEDURAL HISTORY

On July 31, 2003, Plaintiff American Motorists Insurance Company (AMICO) filed a complaint for declaratory judgment in the General Court of Justice, Superior Court Division of Buncombe County, North Carolina, seeking a declaration of its duties pursuant to a series of general liability insurance policies which it issued to the Defendant CTS Corporation (CTS) on a yearly basis from January 1, 1980, through January 1, 1987, and a comprehensive catastrophe liability policy issued from September 29, 1971, through January 1, 1975. **Complaint, *attached to* Notice of Removal, filed September 3, 2003, at 1–2.** CTS, it is alleged, owned and operated an electroplating manufacturing facility from 1959 until 1987 at a site in Skyland, North Carolina, which has come to be known as the "Mills Gap Road Groundwater Contamination Site," due to groundwater contamination allegedly caused by CTS. *Id.* CTS has sought insurance coverage from AMICO in connection with claims by North Carolina residents who own residential property near the Site for personal injury and property damages as a result of contamination of ground water and springs from which those residents obtained drinking water. *Id.* In addition, CTS seeks insurance coverage from AMICO to cover CTS's liability to the United States Environmental Protection Agency (EPA) to recover the costs incurred by the EPA to restore the Site pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). *Id.* AMICO is an Illinois corporation. *Id.* CTS is an Indiana corporation with its principal place of business in Elkhart, Indiana. *Id.* CTS was the parent company of CTS of Asheville, Inc., which was a North Carolina corporation with its principal place of business in Asheville, North Carolina. *Id.* CTS removed the action to this Court on the basis of diversity jurisdiction. **Notice of Removal, *supra.*** In the complaint, AMICO seeks only declaratory relief as to its obligations to CTS under the terms and provisions of the insurance contracts at issue. The underlying claims by the North Carolina residents and EPA are not at issue. Almost eight months after removing the action to this Court, CTS moved to transfer venue.

### II. DISCUSSION

■ A district court has the discretion to transfer "any civil action to any other district ... where it might have been brought" for "the convenience of parties and witnesses." 28 U.S.C. § 1404(a). As noted above, this is a declaratory judgment action. Therefore, the undersigned must determine whether the action could have been brought in the United States District Court for the Northern District of Indiana.

[A] federal court may properly exercise jurisdiction in a declaratory judg-

ment proceeding when three essentials are met: (1) the complaint alleges an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment; (2) the court possesses an independent basis for jurisdiction over the parties (*e.g.*, federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction.

*Volvo Constr. Equip. of North America, Inc. v. CLM Equip., Inc.*, 386 F.3d 581, 592 (4th Cir.2004) (quotations omitted). The parties do not dispute that an actual controversy exists. *Id.* at 593 ("**The Dealers acknowledge that an actual controversy exists under the Declaratory Judgment Act when a plaintiff seeks declaratory relief in order to avoid the accrual of potential damages for past actions.**"). "[I]f the parties are diverse, a federal court may possess subject matter jurisdiction [in a declaratory judgment action] over a state-law contract dispute." *Id.* at 592. If the action had been brought in Indiana, there would have been diversity jurisdiction since AMICO is an Illinois corporation and CTS is an Indiana corporation. *Id.*; *accord, Continental Cas. Co. v. Fuscardo*, 35 F.3d 963, 965 (4th Cir. 1994). Moreover, the Indiana court would not abuse its discretion in exercising jurisdiction over this action since "declaratory relief 'will serve a useful purpose in clarifying and settling the legal relations in issue' and 'will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Volvo, supra*, at 594 (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir.1937)).

█ Thus, having determined that the action could have been brought in Indiana, the issue is whether this Court should grant the motion to transfer venue. In ruling on that issue, the undersigned will consider the following factors: (1) the Plaintiff's choice of forum; (2) the residence of the parties; (3) the relative ease of access of proof; (4) the availability of compulsory process for attendance of witnesses and the costs of obtaining attendance of willing witnesses; (5) the possibility of a view; (6) the enforceability of any judgment obtained; (7) the relative advantages and obstacles to a fair trial; (8) other problems which might make the litigation more expeditious and economical; (9) the administrative difficulties of court congestion; (10) the interest in having localized controversies resolved at home and the appropriateness in having litigation of a diversity case in a forum that is at home with the state law that must govern the action; and (11) the avoidance of issues involving conflict of laws. *Rice v. Bellsouth Advertising & Pub. Corp.*, 240 F.Supp.2d 526, 529 (W.D.N.C.2002). The Court begins with a brief recitation of the facts presented by the parties.

AMICO is an Illinois corporation with its principal place of business in Long Grove, Illinois. Complaint, *supra,* ¶ 1. CTS is an Indiana corporation with its headquarters in Elkhart, Indiana. *Id.,* ¶ 2. CTS owned CTS of Asheville, Inc., a subsidiary, which operated until approximately 1987 but is still registered to do business in North Carolina. **Answer, filed September 26, 2003; CTS's Memorandum in Support of Motion to Transfer Venue, filed May 17, 2004, at 2.**

On June 18, 2002, CTS received a letter from an attorney in Asheville, North Carolina, who represents members of the Robinson and Rice families of Asheville who "have suffered both diminution of property value and personal injury as a result of alleged contamination of their drinking water, allegedly attributable to the operations of CTS, or its former subsidiary, CTS of Asheville, Inc., at the [Mills Gap Road Groundwater Contamination] Site." **Exhib-**

it 7, *included in* CTS's Appendix of Exhibits, filed May 17, 2003. On July 19, 2002, CTS provided notice to AMICO of these claims. *Id.*

On September 4, 2002, the EPA provided notice of potential liability to CTS in connection with the same Site.

The Mills Gap Road Groundwater Contamination Site, also known as the "CTS Site," consists of approximately fifty-seven (57) acres of property, nine (9) acres of which have been enclosed and used for industrial purposes, located on Mills Gap Road, approximately one (1) mile east of Skyland, Buncombe County, North Carolina[.] CTS owned the Site and also operated an electroplating facility on the Site from approximately 1959 until 1987, when CTS sold the property to Mills Gap Road Associates.

.    .    .    .    .

The cost to date of EPA's response actions at the Site is approximately $53,804.19.

**Exhibit 9,** *included in* **CTS's Appendix.** CTS is the only entity which is potentially liable for damages stemming from the Mills Gap Road Site.

CTS has been named as a potentially responsible party in connection with three other sites, all of which are located in Indiana. AMICO has declined to provide coverage in connection with any of these sites, although no claim for such coverage has been made in this lawsuit. The Himco Landfill Site, in Elkhart, Indiana, was proximate to the location at which CTS had a plastics plant. **Exhibit 12,** *included in* **CTS's Appendix.** CTS was one of 43 potentially responsible parties for the clean up of that Site. **Exhibit 19,** *included in* **CTS's Appendix.** By May 2003, that number had increased to 66 potentially responsible parties. **Exhibit 26,** *included in* **CTS's Appendix.** Close to $20 million had been spent by the EPA in connection with this Site. **Exhibit 27,** *included in* **CTS's Appendix.**

In 1986, CTS was advised that it was a potentially responsible party for "The American Chemical Service Site," in Griffith, Indiana. **Exhibits 28 and 29,** *included in* **CTS's Appendix.** CTS was one of 190 potentially responsible parties, a number which had increased to more than 361 by 1993. **Exhibit 30,** *included in* **CTS's Appendix.** American Chemical, however, operated the solvent recovery site at this location. **Exhibit 31,** *included in* **CTS's Appendix.**

In 1993, CTS was advised that it was one of approximately five potentially responsible parties for the Main Street Well Field Site in Elkhart, Indiana. **Exhibits 42 and 46,** *included in* **CTS's Appendix.** The extent of any liability on the part of CTS was resolved in 2002. *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.,* 285 F.3d 609 (7th Cir.2002).

■ CTS correctly notes there are no issues in this action concerning the underlying groundwater contamination and any injuries which may have resulted therefrom. This declaratory judgment action addresses only the issue of whether AMICO is obligated to provide insurance coverage and a defense for CTS in connection with such claims. In that regard, the comprehensive catastrophe liability insurance policy was issued by AMICO from its home office in Illinois to CTS at its home office in Elkhart, Indiana. **Exhibit 4,** *included in* **CTS's Appendix.** The policy does not contain a choice-of-law provision.

Likewise, the general liability insurance policy was issued by AMICO from its home office in Illinois to CTS at its home office in Elkhart, Indiana. **Exhibit 5,** *included in* **CTS's Appendix.** The policy applied to CTS operations in Indiana, Arkansas, Texas, Illinois, California, Ohio,

and North Carolina. *Id.* The policy does not contain a choice-of-law provision.

" 'A plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request, and that choice ... should not be lightly disturbed.' " *Rice,* 240 F.Supp.2d at 530 (quoting *Datasouth Computer Corp. v. Three Dimensional Tech., Inc.,* 719 F.Supp. 446, 451 (W.D.N.C.1989)). The existence of a forum selection clause in these contracts would have weakened the deference given to the Plaintiff's choice of forum. *Id.* However, no such clauses exist in these contracts. Nonetheless, a plaintiff's choice of its home forum is entitled to greater weight than its selection of a foreign forum, as was the case here. *Production Group Int'l, Inc. v. Goldman,* 337 F.Supp.2d 788 (E.D.Va.2004). And, the deference provided to a plaintiff's choice is proportionate to the relationship between the forum and the cause of action. *Parham v. Weave Corp.,* 323 F.Supp.2d 670, 673 (M.D.N.C.2004). It is disconcerting that AMICO would choose a North Carolina forum when there are three other sites, all of which are located in Indiana, as to which the issue of coverage must be determined. And, it does not appear that a declaratory judgment action has been brought by AMICO as to any of these Indiana sites. Thus, any resolution in this Court of the coverage issue has the possibility of leading to inconsistent rulings. The undersigned finds, on these facts, that the Plaintiff's choice of forum is not entitled to great deference.

The next factor, residence of the parties, weighs against retaining the action. While the underlying corporation, CTS of Asheville, Inc., was a North Carolina resident with a presence here in Asheville, that entity no longer exists. And, the dispute is not between that entity and AMICO but between its parent corporation and AMICO. Moreover, this dispute does not involve the underlying claims resulting from groundwater contamination; this dispute is a matter of contract interpretation to determine whether AMICO must provide a defense and coverage. *North Shore Gas Co. v. Salomon, Inc.,* 152 F.3d 642, 648 n. 3 (7th Cir.1998) **(Plaintiff, an Illinois corporation and sole surviving corporate entity of investor in Colorado plant, brought declaratory judgment action in Illinois for declaration that it had no responsibility to contribute to CERCLA clean up costs assessed by the EPA against parent corporation of surviving plant. "Salomon argues that the district court should have transferred the case because (1) important evidence and witnesses are located in Colorado and (2) Colorado has the strongest interest in resolving North Shore Gas' liability. However, Salomon has failed to demonstrate that the evidence and witnesses in Colorado are relevant to the liability of North Shore Gas, and to recognize that Illinois has a strong interest in the fate of North Shore Gas—an Illinois corporation.")**. Since neither CTS nor AMICO resides in North Carolina, this factor weighs against retention.

AMICO argues that numerous witnesses and the actual groundwater site are located here in North Carolina. As a result, if the action is transferred, it argues, those North Carolina residents will not be subject to compulsory process. Such witnesses, they claim, are necessary for a determination of whether, under the terms of the insurance contracts, an "occurrence" which is covered can be shown or whether the pollution exclusion provisions control. By the same token, however, AMICO argues that "the potential witnesses identified by CTS are primarily CTS corporate managers and other corporate employees, or former corporate employees. As a party, CTS itself should be expected to produce current employees for testimony

without any need for subpoenas." **AMICO's Memorandum of Law in Opposition to Defendant's Motion to Transfer Venue, filed July 19, 2004, at 19.** This essentially negates AMICO's argument on this point.

Moreover, it is not likely that testimony from employees at the North Carolina site will be determinative of the interpretation of the language of the insurance contracts. At issue is the meaning of the pollution exclusion clause in these contracts which excluded from coverage damages arising out of the discharge of pollutants into land or water unless the discharge was "sudden and accidental." **Exhibit 5,** *supra.* The meaning of pollution exclusions in such contracts involving CERCLA has been extensively litigated for many years. CTS argues that AMICO intentionally selected North Carolina as a forum rather than Indiana because the North Carolina Supreme Court has conservatively interpreted pollution exclusion provisions of such insurance contracts. *See, e.g., Waste Management of Carolinas, Inc. v. Peerless Ins. Co.,* 315 N.C. 688, 700, 340 S.E.2d 374, 383 (1986) (**"Waste material that has leached into and contaminated groundwater is clearly excluded by the plain terms of the pollution exclusion. And because the "sudden" release or escape of contaminants was neither expressly nor impliedly alleged in the pleadings ..., the alleged occurrences remain outside the policy coverage."**). While North Carolina would require the release of the pollutant to have a temporal meaning, the Indiana Supreme Court in *American States Ins. Co. v. Kiger,* 662 N.E.2d 945 (1996), found the "sudden and accidental" language contained in a pollutant exclusion to be ambiguous and held that it should have been interpreted to mean "unexpected" and "unintended." It thus appears that retaining the action in this Court could lead to inconsistent verdicts involving the same parties and the same insurance contracts.

The majority of the witnesses will be corporate employees from the Indiana and Illinois offices of CTS and AMICO who were involved with the negotiation and execution of the insurance contracts. Indeed, there are currently no corporate employees for the defunct North Carolina entity. To the extent that testimony or evidence from former employees is necessary, it is customary for litigants to depose such witnesses in their state of residence. However, AMICO concedes that some travel by the parties' attorneys will be necessary. "Given the fact that regardless of where this case is litigated, the parties will be required to take out-of-state depositions, the location of CTS's corporate witnesses, government employees, and documentation should have little impact, if any, on deciding the proper venue for this case." **AMICO's Memorandum, at 21.** There is no evidence that former employees who are North Carolina residents were involved in the negotiation and finalization of the insurance contracts. While these factors most likely would differ if the actual liability in the underlying groundwater case were being litigated, such is not yet the case. The issue for resolution in this action is whether and to what extent AMICO, under the terms and provisions of the insurance contracts, must provide a defense and coverage for any damages arising from that contamination.

Nor does the undersigned find that a view of the North Carolina site would be beneficial to the issue of contract interpretation. As discussed *infra,* the interest in having localized controversies settled at home weighs in favor of transferring the case to Indiana. In this diversity action, either Illinois or Indiana has a greater interest in the application of its law to the

parties who are corporate residents of those states.

AMICO cites N.C. Gen.Stat. § 58–3–1 which provides that contracts of insurance on property within this state are subject to North Carolina law, claiming this amounts to a choice-of-law provision. The insurance policies at issue here are general liability insurance and comprehensive catastrophe insurance policies issued to CTS in Indiana. The doctrine of *lex loci contractus* mandates that the substantive law of the state where the last act to make a binding contract occurred controls the interpretation of the contract. *Fortune Ins. Co. v. Owens*, 351 N.C. 424, 526 S.E.2d 463 (2000). In the context of insurance policies, that act usually occurs upon the delivery of the contract which occurred, in this case, in Indiana not North Carolina. *Id.; accord, Nas Sur. Grp. v. Precision Wood Products, Inc.*, 271 F.Supp.2d 776 (M.D.N.C.2003). AMICO's argument is, therefore, rejected.

The factor involving enforceability of a judgment is neutral. Although CTS cites court congestion as a factor, the congestion noted lies in the other divisions of this District. Nor can it be overlooked that CTS waited eight months after appearing in the action to make this motion. The Court finds all remaining factors neutral.

Having considered all the factors, and noting the Plaintiff's initial choice of forum was a North Carolina state court, the undersigned nonetheless concludes that this action should be transferred to the Northern District of Indiana.

## III. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's motion to transfer venue is **GRANTED** and this action is hereby transferred to the United States District Court for the Northern District of Indiana, South Bend Division.